Good morning, Your Honors, Counsel. My name is Vicki Ruby, and I represent Deputy Brian Krook in this matter. The issue before the Court today is whether it was clearly established that using deadly force when confronted with an armed suicidal person who, contrary to orders to put down the gun, rotates his head and the firearm held to it, causing the firearm to arc toward and be directed at deputies through his head, violates the Fourth Amendment. As there is no Eighth Circuit case law that prohibits using deadly force under these circumstances, and since three Circuit Courts of Appeal have found the use of deadly force under analogous circumstances, Deputy Krook is entitled to qualified immunity. Do we know definitively that it was ever pointed at Officer Krook? In this case, plaintiff has admitted that statement. He has offered two experts. The first is Jeff Noble. Jeff Noble, his report indicates, and this is at the appendix 1356, Evans' head was between the gun and the deputies when shots were fired. The second expert is Dr. Greenstone, who agreed that when Evans turned his head toward the south, which would be his right, that would cause the direction of the muzzle of the gun through Mr. Evans' head to point toward the deputies at Ramirez's squad. We also have in discovery that the muzzle of the gun is planted on the right side of Mr. Evans' head, and when he rotates the head, the muzzle moves, always at a 90-degree angle facing away from where his eyes are looking. The example given in discovery is when looking north, the sight of the handgun is facing west. Here it's undisputed that the time shots were fired, he is looking south, causing the handgun, the sight of the handgun to face east, where Deputy Ramirez's squad is pointed. And further, the gun doesn't need to even point directly at Deputy Krook or any of the officers at the squad. This court's precedent has indicated that when the arc of the gun is moving toward officers, that it becomes reasonable to use deadly force. That's been articulated time and time again, Rogers versus King, Apershoff versus McIrney, Partlow versus Sadler, Dooley versus Thrapp. We would submit that as soon as the gun starts rotating in that manner toward the deputies, that they're entitled to, that Deputy Krook is entitled to respond with deadly force. Any of these involve, I mean, I think it's undisputed that the gun was not removed from his being pointed at his head toward an officer, correct? Correct. The record does not illustrate that, for example, the arm was extended to point the firearm at the officers, rather it remained up to Mr. Evans' right temple at the time. The whole theory is that it had to be pointed at them through his own head, right? There's two-fold. Yes, pointed at them through his head, and there's evidence in the record from the M.E. Butch Houston that even a self-inflicted gunshot wound through the temple could travel 40 feet and penetrate a wall. Here the officers are within that range. Deputy Krook appreciated that risk. He testified that he was aware that bullets continued on, and in fact, we've added to the record in this case another instance from a different jurisdiction where a self-inflicted gunshot wound went through a suspect's head, perforating it, and actually shot a negotiator. That's found in the record at 1231 through 1251. This is not an imaginary threat. This is a threat the Sixth Circuit found very real in Evans versus the United States, where the court said even a self-inflicted gunshot wound based on the positioning of the head, which caused the muzzle point toward the agent, would result in the bullet coming toward the officers. We would submit that that case, as well as the logic that was applied by the Eleventh Circuit in Krasinski versus Bradshaw, and the District of Kentucky where they applied it in Thurman, that it's just a quick movement from the head to the officers as well. That can change in an instant. Officers have never been called upon to bet their lives on the unpredictable actions of a subject who has been warned, mind you, 60 times to put down the gun and has refused to do so. Mr. Evans in this case is a threat. We've got nine officers from four separate departments out there that have their firearms trained on him. They're trying to shut down streets, keep civilians in their homes, issuing a code red. If he was no threat at all, we could have walked up to him and given him a cell phone. We couldn't because he was a threat at all times. Mr. Evans here understood he was a threat. He'd been trained in law enforcement tactics. The district court found at pages 7, 9, and 12 of its order that Mr. Evans referred to himself as a threat, indicating that he appreciated that his conduct was reasonably perceived as threatening throughout the incident. Plaintiff instead... But he also went to great lengths to suggest that he intended no harm to the officers. I think he actually removed the clip and threw the clip away at one point. Does that make any difference? That does not resolve the threat in this case, officers. We acknowledge that he discarded the magazine, leaving one round in the chamber. He always said... But he also on numerous occasions said, I don't intend to do you guys any harm, you're doing a great job, et cetera, et cetera. Well a subject's subjective intent, what they're indicating to officers is not the dispositive issues. Here in this case, officers aren't required to bet their lives on the fact that somebody says they won't hurt them. It's commonplace for officers to have subjects downplay criminal conduct, downplay their intent to try to get officers' guards down. Plaintiff doesn't cite a single case where an officer is required to bet their personal safety on that representation of a suicidal armed person who for 40 minutes fails to put down a gun despite repeated orders to do so. I would like to address one of the core... Let me, before we get there, this is really a jurisdictional question, but isn't the heart of this appeal really a fact dispute about whether and how Evans' gun was pointed? No, Your Honor, it isn't. I'd like to direct the court to various points of the district court record. Here, the district court found at pages 8 and 11 that Evans had a loaded firearm, found that he failed to comply with commands at pages 8 and 11. The head rotated, that's at page 11 at the time shots were fired. At the time shots were fired, the video here shows that he's, again, planning towards the right, the south, which plaintiff has admitted would cause the muzzle of the weapon, albeit through his head, to point back toward the officers. I've went through those citations, the expert testimony previously. The expert testimony, and maybe you can point me to the right thing. What I gathered from that was that the head was turning, not necessarily that the muzzle was pointed at any particular officer. I would direct the court to Appendix 1356. When they're talking about the deadly force, the moment that the first shot goes off, Mr. Evans' head was between the gun and the deputies. I would submit that that's enough, particularly under our case law within the Eighth Circuit, that when the gun begins arcing towards the deputies, that they don't have to wait until they're facing the business end of the gun. Here we have expert testimony that says the head's always between the muzzle and the deputies. That's enough. Again, that's the proposition that's granted officers qualified immunity in James, in Thurman, in Grazinski, and in Evans. Plaintiff hasn't identified a single case that deals with that head turning movement that causes the muzzle to point toward the officers. Instead, the clearly established law as articulated by the district court and adopted by plaintiff is focused on Cole versus Hutchins. Of course, that had happened 40 some odd times before that. I would like to talk about those rotations. You hear plaintiffs make much of 44 rotations. That's a bit of a misnomer. If you actually look at the rotations which plaintiff has purportedly put in the record at Plaintiff's Appendix 2 through 45, which we've objected to because that was not produced during discovery, it's a video that plaintiff created, but in any event, seven rotations that they cite to occurred before Brian Crook even arrived. There's 15 rotations that occurred when the gun is to Mr. Evans' chest, which doesn't present the same concern. There's 11 rotations that occurred when he's rotating to his left, the north, which causes the gun to point away from the squad. So what were left is 11 rotations, seven of which occurred in the final six minutes of this incident.  We have officer testimony that said, what's happening at the time shots are fired? He's moving around a lot more. That was the concern that they had here. So it's a misnomer to say he made the exact same movement 44 times. This is a controlled situation. The officers didn't know what Evans intended to do next. They didn't have that information at any time throughout this encounter. And just simply because Deputy Crook exercised restraint in not firing the first time that head rotation occurred does not make a subsequent use of deadly force unreasonable. The Fifth Circuit dealt with that issue in Reese v. Anderson. It was a case for a hands-up, hands-down, hands-up case. After making that movement several times, the subject dropped his hands again and was shot and killed. That did not render the reasonable use of force unreasonable simply because the subject had made that movement multiple times. I would also like to note that it's not unusual for officers to forego the exercise of the use of deadly force to great personal risk to their safety simply because Crook exercised restraint initially does not somehow invalidate the lawful basis to use deadly force at the time he did so. Judge Gross alluded to, and I think the district court found, that there was this fact question about whether it was pointed, which causes you to have to come up with incontrovertible evidence. You've pointed to the so-called admissions in the expert reports. Is there anything beyond that? I would direct the court... I've looked at the video and it's unclear to me from the video. The court, in this case, focused heavily on the video and the video, they said, was unclear. That puts us in Smith v. Kilgore, where we look at the testimony. The testimony is that the head's turned, the muzzles to the head, and that's all we need to have... Does that require us to look at the facts of the light most favorable to the movement rather than the plaintiff? No, it does not, Your Honor. The plaintiff has never disputed that the gun is to his head and he's rotating his head. What we're asking and what the court's required to do is look at this instance from the objectively reasonable standard of an officer standing at the scene. An objectively reasonable officer is going to see that rotation causing the muzzle of the gun, when he's rotating with it to his head, to point at the officers. That's the inquiry that governs. Not necessarily. I mean, if I'm doing this, I'm never pointing at you. Judge Shepard might be in trouble, but I'm never pointing at you. It's undisputed, Your Honors, that he would be in your position, for example, and that the rotation is to the right. The only way that gun points at that time is back towards that squad. But do we know exactly where the officer is? Maybe the officer's where Ms. Hyatt is. We have a photo in the record. It's 1180, and it shows that Deputy Crook is the furthest north officer on the passenger side. He's the first officer that's getting flaked by that firearm when he rotates. I'd like to save the remainder for rebuttal. Very well. Thank you. Mr. Medea? Thank you, Your Honor. May it please the Court, Deputy Crook opened fire on a man who was on his knees 40 feet away from him, who had one bullet aimed only at his head, and who had said repeatedly through the night, this bullet is for me, I would never hurt any one of you. Of course, that doesn't necessarily mean he doesn't put him in danger. Of course. So then we look to the totality of the circumstances, what is objectively reasonable. Every other officer there with Deputy Crook said that Evans never posed a threat, they didn't feel threatened by him, and he never pointed the gun at any one of them. So what Deputy Crook relied on to the District Court was the video. And they said, well, this video shows that Evans pointed the gun at Deputy Crook. And the District Court viewed the video and said, well, I think it's inconclusive. I can't see where the gun is because it's blocked, because the video is grainy, it's blocked by his head. I can't see where Crook is because he's not in this picture. I don't know if the gun was pointed up or down or left or right. I can't say as a matter of law where this gun was pointing. A jury needs to resolve that fact dispute. And so now to avoid having a jury resolve that fact dispute, Deputy Crook makes three extraordinary requests of this Court. First, he asks this Court to determine as a matter of fact, not just as a matter of fact, but that, determine as a matter of fact that the gun was pointed at Crook, even though you can't see the gun and you can't see Crook in this video, and that the video blatantly contradicts all of the other evidence creating fact disputes in this case. That's the first extraordinary ask. The second extraordinary ask is they ask this Court to make new law and say that as a matter of law, a gun is pointed at an officer when someone is not looking at an officer and the gun is actually pointed at someone's head. And third, they ask the Court, they make the extraordinary request to say that even when an officer admits that a warning is feasible for the very conduct that he feels threatened by, that is this head-turning movement, and he admits that it was feasible to give that warning, he's not required to do so before opening fire. Now some of these requests would involve either overturning or significantly narrowing a number of this Court's precedents. But so frankly, we think that they lose. What about the so-called admissions by the experts? Thank you, Your Honor, for that. So a couple points on that. We think it's a pretty thin argument, but first, again, I'm not sure the Court has jurisdiction over it because they didn't raise that to the District Court at summary judgment. They never made as part of their arguments that we have these admissions and therefore it's conclusive and the District Court should consider it. My understanding is that a party is not allowed to raise arguments for the first time at the Aside from that, even had they been raised, I think the reason they didn't raise them is because those experts, one, the expert that they're relying on was a police training expert, not a ballistics expert, and that expert was withdrawn even before summary judgment, so it wouldn't even be admissible evidence or evidence that he was competent to testify about. And I think the second admission that they rely on is something from a Rule 408 letter, some settlement correspondence between counsel very early in the case, which again, at least my reading of Rule 408, is that doesn't come in on issues of liability, and even then it was a very vague and sort of tangential thing. So we sort of go into further detail on some of these technicalities in the briefing, Your Honor, and I think that probably the most clear point is that none of this was raised to the judge below, and so I don't see how it can be raised now. I'd like to, I think that Deputy Crook loses on all three of these major requests that we've discussed, but if it's all right, I'd like to start with the jurisdictional argument because I think that's kind of a threshold. In Colvie-Hutchins, this court, I think, gave a very detailed opinion saying that deadly force against someone with a weapon is authorized, one, if that person is acting in a menacing way with that weapon, or two, if that person points that weapon at an officer or at somebody else or at their party. And it sort of built on the Nance case, which says that someone has to be ready to shoot, and it kind of took that a little bit further, and they said, okay, menacing or pointing the weapon. And so here on the menacing question, I think it's very difficult to argue that there's no fact disputes at the very least on that, given all of the totality of the circumstances where this was a welfare call. They were checking on his welfare because he was a suicide threat. It wasn't that he was suspected of some crime, that he emptied the magazine and tossed it to him. It was a 40-minute encounter that they said he was cooperating on, that he said he was only going to harm himself. He would never harm any of the other officers, that he was on his knees, that he was 40 feet away. I mean, I think it'd be very difficult for them to say there's no fact question on the menacing. So then I think they come to, well, that's how they got to this, well, he was pointing it at us. And so, and for that, all of the officers there testified he never pointed the weapon at them, at anybody. So now then, they're sort of into this corner where they have to say, well, the video provides this income. That probably depends on how one defines pointing. I mean, they may have taken that as he didn't do this, but if he did this, maybe he was. Yes, sir. That's true. It's possible that that's what the officers meant. I mean, what they testified and what the record says is that they never pointed at them. But I think questions about what the officers meant would probably be fact questions for a jury to determine as well. So then I think they're back into this, well, the video proves that Evans pointed the gun at Deputy Crook. But here they have the problem that the video, one, the video is very grainy. Two, you can't see the gun. And three, you can't see Crook. And so, I think the district court made the rather unremarkable conclusion that this is inconclusive. I can't tell as a matter of law that this is pointing at this officer. And so, a jury needs to sort that out. And so, with those fact questions, I don't think that this court has interlocutory jurisdiction at this point. I wanted to address this. There's been something made of, well, officers are not required to bet their lives on the subjective intent or the subjective statements of anybody. And that's true. We all agree with that. That's not the law. The law is, though, the totality of the circumstances. Something has to be objectively reasonable. And we've talked about the totality of the circumstances with respect to this man on his knees who was only talking about suicide, who had emptied the magazine at only one round and so forth. But then, there's also the totality of the circumstances that he had made this motion, I mean, we've said 44 times and I think they've sort of parsed that now and said, well, only several of these were with the head and in this particular way. But it's undisputed that even with Deputy Crook, this particular movement had been made by this suspect a number of times. And Deputy Crook asked one of the fellow officers, one of his fellow officers, why is he doing this? And the officer said, oh, he's just turning around to see no one's behind him. And then Deputy Crook said later, okay, this is starting to bother me. But even in that time, Deputy Crook never issued a warning then or told anyone to issue a warning, hey, stop moving your head because it's bothering me or I'm taking that as a threat. And in fact, Deputy Crook testified that he decided to shoot this young man 14 seconds before he actually did. So, he made the decision and then he waited 14 seconds for the next head movement and then he opened fire, which by the way, all of his fellow officers understood that he was going to use less than lethal ammunition like sandbags and even Crook himself said that he was going to use less than lethal. So the fact that he opened fire with lethal ammo stunned everybody there. So this isn't about the subjective intent of Mr. Evans or what he was saying. This is about all the facts that Deputy Crook knew and observed and that his fellow officers around him knew and observed. And then I think they say, well, this court or no court can consider what other officers on the scene thought, but that's not, I mean, that's the Wilson v. Des Moines case. I think this court said that's highly relevant evidence. They say, I think they just raised this point about, well, there's an expert who says the bullet could have gone through Mr. Evans' head and traveled 40 feet at a lethal speed and struck Deputy Crook. But that, I think that that's inaccurate as well because there is no ballistics expert in this case. For some reason, they didn't, on this record, the expert they're talking about is a pathologist, is a medical examiner who examines the cause of death and was asked a hypothetical, but there's no ballistics examiner. There's no sort of accident reconstructionist or anybody who's put any evidence like that into the record. Is there a dispute of fact as to which shots were the fatal shots? Your Honor, I don't . . . The reason I ask, all the discussion so far this morning has been about the first volley and no reference to the second group as the officers approached the deceased. Yes, sir. Thank you. May I speak to that? Your Honor, on the second round of shots, there is an additional fact dispute now because his hand, what the record evidence shows with several of the officers, including Deputy Crook, said is after the first volley, first he continued to have the weapon to his head as he's laying on the ground and then they came close to him. They said, drop the gun, drop the gun, drop the gun, and he starts lowering the gun and then they open . . . and then, I shouldn't say they, but Deputy Crook opens fire again. At least at that point, Your Honor, he was alive and I think everybody agrees with that. There is no testimony, though, to answer your question about whether the first volley of shots would have killed him even absent the second volley or the third volley. I want to emphasize that there's also a third volley of shots because even after his hand went down after the second volley and the gun was then released, then Deputy Crook took a couple of steps back, waited a couple of seconds, and then opened fire again for a third volley of shots. But to directly answer your question, Your Honor, there is no expert testimony in the record as to which volley of shots were ultimately the fatal shots. I'd like to just, in my remaining time, talk about this issue of the warning because they made an issue of the briefs and then even this morning they said, well, we told him sixty times to drop the gun and so that's a sufficient warning. But what I want to emphasize is it's different from the cases of this court because Deputy Crook isn't saying that he shot this man because he had a gun. He's saying he shot him because of this head movement. And so the question is, if that is the action that was perceived as being threatening, even though it had been done forty times or a dozen times or seven times or whatever number you choose, and if the officer says it is feasible to issue a warning saying, knock it off, that's threatening to me, which is in the record, Deputy Crook did so admit, then that warning is required to be given prior to opening fire. I think that's pretty clear from this court's precedence. Lastly, on this issue of cases that are sort of analogous in facts, including cases from other circuits, we've covered this in detail in our brief, but I wanted to just emphasize both of this court's Partridge cases from 2019 and 2023, it's very similar facts, as in the Fifth Circuit. Unless there's any further questions, that's all I have. Thank you. Thank you. Thank you. Ms. Ruby Roboto. Thank you, Your Honor. I would like to start out with the threat piece. The expert reports that were talked about today and the expert testimony was a part of the summary judgment record. It was included. That plaintiff ignores that. It was clearly in the record and this is a de novo review in any event. There simply is no fact dispute that he's holding the gun to his head, rotating to his right, which causes, that movement causes the gun to plane towards the officers. With that established, there's jurisdiction and the use of deadly force was objectively reasonable and did not violate clearly established law. I do want to address the comments made about the partners. They were in different locations. Plaintiff has said Crook's eight feet from the passenger side. Plaintiff pled he has a clear view. In contrast, Ramirez is on the other side of the vehicle, so eight feet plus the width of the vehicle plus standing out on the other side. We've got an officer who has an obstructed view looking over the light bar, an officer that doesn't even know if Mr. Evans is standing or kneeling because she can't see behind the squad. Deputy Crook was the officer who was flagged by the gun first. He is the officer who plaintiff pled had a clear view. He was the officer who gave insight during negotiations that the finger's on the trigger so that his partners could convey that because they didn't see it. He did based on his unique position. The plaintiff cannot simply second guess his reasonable conclusion that Mr. Evans was a threat by ignoring that positioning issue. Plaintiff does raise that there's settlement correspondence that contains admissions. I'd like to point out that settlement correspondence that plaintiff cited in their discovery responses is a factual basis for their claim that plaintiff submitted to the court as the factual basis for their claims. Plaintiff can't claim that something's 408 yet submit it as the factual basis for their claims. That simply isn't how 408 works. Here I do want to touch base briefly on the second volley. There's three shots that are fired in two seconds. That's 1147 at 620 through 622. At that time, Mr. Evans is reportedly, a partner's yelling, he's pulling the trigger, he's pulling, he's pulling, he's pulling. He yells it three separate times. That officer, Deputy Hutchinson, said, Deputy Hutchins, excuse me, said he would have fired, but there was crossfire. Ramos said he was preparing to fire. His finger was on the trigger, but Crook fired first. Plaintiff cannot defeat summary judgment by ignoring that, and therefore, we'd ask that you reverse and grant qualified immunity.